## Case No. 11,537.

### In re RAINSFORD

[5 N. B. R. 381.] [1]

District Court, N. D. New York. Feb. 5, 1871.

BANKRUPTCY— DISCHARGE—ACTION TO SET ASIDE —CONCEALMENT—FALSE SWEARING.

A debtor sold his farm for much less than it was actually worth to his father-in-law, who, in turn, deeded it back to the wife for a mere nominal consideration. At the time of the transfer debtor was largely indebted, but believed himself to be solvent. The wife repeatedly told her husband these deeds were burned. He so informed his creditors and procured credit of some of those whom he still owed to a considerable amount on the faith of his actual ownership of the farm and his record title. After his insolvency, these deeds were produced and placed on record, thus giving apparent title to the wife. Debtor was adjudged a bankrupt, filed his schedules without including the farm, and in due time received his discharge. In an action brought to set it aside, the referee held that the bankrupt had been guilty of concealment and false swearing, within the meaning of section twenty-nine of the present United States bankrupt act [of 1867 (14 Stat. 531)], and that the discharge should be set aside and annulled.

---

[1] [Reprinted by permission.]

The petitioner in this case is a banking association and a creditor of said bankrupt [D. A. Rainsford], as stated in its petition, verified in this case by its president on the twenty-seventh day of September, eighteen hundred and seventy. Said petitioner has no knowledge of the alleged fraudulent acts of the said bankrupt stated in his petition, till after the granting of his discharge.

John Van Voorhis, for creditor.
E. M. Morse, for bankrupt.

By J. D. HUSBANDS, Referee:

The history of this case, so far as I deem it pertinent to the issues referred to me, is substantially as follows:

On and before January twenty-seventh, eighteen hundred and fifty-eight, the said bankrupt was the owner of the seventy-six acre farm described or referred to in the petition and answer in this case, together with other property, real and personal. On that day he and Mary Jane Rainsford, his wife, executed to Platt Carpenter, her father, a deed of said farm, subject to a mortgage to one Dibble therein mentioned, on which was then owing the sum of two thousand dollars. The deed expresses no understanding on Carpenter's part to pay this mortgage. He took the title subject to the encumbrance. This deed was acknowledged on the same day, and recorded March twenty-sixth, eighteen hundred and sixty-six, at ten o'clock a. m., in the proper clerk's office. The consideration expressed is two thousand two hundred and eighty dollars—Carpenter in form paying over to said David A. Rainsford two hundred and eighty dollars and no more. Carpenter never intended to take title for himself, but the avowed and actual object of this deed was to enable Mrs. Rainsford to receive the title from her father as a voluntary conveyance by him to her without consideration, subject only to the said mortgage. At that time, the testimony fairly considered, shows the farm to be worth at least fifty dollars per acre, making three thousand eight hundred dollars—or one thousand eight hundred dollars over and above the encumbrance. At the time of this deed to Carpenter, Rainford's business was, and ever afterwards continued to be, a hazardous species of speculations, so that, as he states in his answer (fol. 10), his assignee, to be hereinafter referred to, and who assumed his trust March twenty-sixth, eighteen hundred and sixty-six, had only realized of said bankrupt's property two thousand dollars, up to October twenty-fifth, eighteen hundred and seventy, while his debts were about twenty thousand dollars on the twenty-fourth day of March, eighteen hundred and sixty-six. He continued his speculations after giving the deed to Carpenter. Referee's Minutes, p. 45. Carpenter never intended to take possession of this farm, never assumed any control over its occupancy, or its rents, issues or profits, or its care or management. This bankrupt with his family kept possession of it, and ever since

eighteen hundred and sixty has resided on it, exercising full and absolute rights of ownership over it, and obtaining property on the faith of it, by the acquiescence of his wife and his father; and such was the intent of the whole transaction. He also paid all taxes and the interest on the mortgage, and within three years after the execution of the deed to Carpenter, he paid five hundred dollars of the principal of said mortgage, leaving still unpaid fifteen hundred dollars of principal. Three hundred dollars of this five hundred dollars were so paid in eighteen hundred and sixty; and said five hundred dollars constitutes so much property of this debtor.

Simultaneously with the execution of the deed to Carpenter, and as part of one entire arrangement and transaction, a deed of the same lands, subject to the same mortgage, without any assumption to pay it, was drawn from Carpenter and wife to the said Mary Jane Rainsford, which was executed, acknowledged and recorded March twenty-sixth, eighteen hundred and sixty-six.

At this time Rainsford, this bankrupt, was largely indebted, but believed himself solvent; though he was borrowing considerable monies and had lost six hundred dollars or seven hundred dollars on cattle and sheep. He says (Referee's Minutes, p. 44) he had personal property enough in spring of eighteen hundred and fifty-seven to straighten up with all, "except those who would wait." He says he paid all his debts in spring of eighteen hundred and fifty-eight, that "were necessary to be paid." He says he paid his debts in eighteen hundred and sixty, and had fifteen hundred dollars left (page 33). How this would have been without the beneficial use of the seventy-six acres and the house it furnished, does not appear. His solvency depended on the hazards of a hazardous and fluctuating business. His was a feverish pecuniary condition. From time to time Mrs. Rainsford told her husband these deeds were burned. He so informed his creditors, and procured credit of some of those whom he still owed to a considerable amount, on the faith of his actual ownership and his record title. This the parties intended he should do. Beyond a rational doubt, the object of this transaction originally was to cast on his creditors the hazard of his speculations, and to provide a family home in case of disaster. Actual results show these speculations in eighteen hundred and sixty-six had produced hopeless insolvency, including this farm of seventy-six acres as assets. See Carpenter v. Roe, 10 N. Y. 227; Hinde's Lessee, 11 Wheat. [24 U. S.] 199; Babcock v. Eckler, 24 N. Y. 630. Subsequent acts and declarations are competent upon the subject of intent of the original transaction. Wilson v. Ferguson, 10 How. Prac. 178; Beattie v. Gardner [Case No. 1,195], and cases and maxims cited by Judge Hall. "Every person of sound mind is presumed to intend the natural or legal consequences of his deliberate act." Per Judge Hall, in Re Smith

[Id. 12,974]. See, also, Bininger's Case [Id. 1,420], per Judge Blatchford. This case was affirmed by the United States circuit court, and the same views enforced by Judge Woodruff. Also see there cases on the subject of general denials of fraud.

Daniel A. Rainsford kept up an active business in the purchase of produce and farm productions till in the spring of eighteen hundred and sixty-six, all the time exercising undisputed ownership of this seventy-six acre farm, as its conceded owner. On the twenty-second day of March, eighteen hundred and sixty-six, he made up his mind to make an assignment for the benefit of some of his creditors—in form for all—in fact, by its preferential effect, for the benefit of a favored few. He denies he said he so intended on the twenty-second of March, eighteen hundred and sixty-six, but a reputable witness swears he did, and Rainsford may forget. At all events, on the twenty-third day of March, eighteen hundred and sixty-six, he employed Messrs. Ives & Harris, of Rochester, to draw such an assignment for him, which was accordingly drawn on the twenty-fourth, and executed that day and sent by his son to the assignee. On the twenty-third he procured one thousand dollars, less discount, from the Flour City Bank of Rochester on his draft on S. W. Nettle, his consignee at Albany, on whom he had drawn other drafts on and about the nineteenth of March, making in all three thousand drawn on him and outstanding on the twenty-fourth of March, eighteen hundred and sixty-six. He had not settled with this consignee in about a year, and had an open account with him of some one hundred and fifty thousand dollars. The account afterwards rendered by this consignee, without payment of any of these drafts, showed a balance in Rainford's favor of four hundred dollars or five hundred dollars, which was paid to his assignee named in said assignment of March twenty-sixth, eighteen hundred and sixty-six. In this assignment he included this seventy-six acre farm as a part of his property, believing it to be his as absolute owner, and that the deeds were burned, which, in his opinion, re-invested him with its title. On the twenty-third March, eighteen hundred and sixty-six, he purchased a gold watch in Rochester, paying in part therefor by a note of one hundred and fifty dollars he held, and by a credit given to himself for a short time of fifty dollars; showing money, but stating it as a convenience to have a little credit. On the day before he made his assignment he had three thousand dollars on hand, and nobody was pressing him. This sum of three thousand dollars he gave to his son, Edgar M. Rainsford, to pay, as D. A. Rainsford claims, a debt to Merrick Sheldon, who married his niece and resided at Mount Morris, eleven hundred and fifty dollars with the gold watch; sixteen hundred and eighteen dollars and forty-eight cents to Edgar, claiming that he owed them these amounts substantially;

and the residue of said three thousand dollars, to pay small debts. He intended by these transactions and his assignment to pay off all his relations as far as he could. Parker's Minutes, p. 10. His assignee is his wife's brother, who is a preferred creditor in the sum of seventeen hundred dollars, and a rather loose, vague and unsatisfactory statement of indebtedness. Soon after that he confessed judgment to this assignee for two thousand seven hundred and forty-four dollars and fifty-five cents, to give him a preference in the race of creditors. Parker's Minutes, pp. 8, 9. His son, Edgar M. Rainsford, in March, eighteen hundred and sixty-six, was about twenty-two years of age. Parker's Minutes, p. 55.

Having put his assignment in the hands of a son for delivery to his assignee and brother-in-law, on Saturday, the twenty-fourth of March, eighteen hundred and sixty-six, at Rochester, he himself went to Sheldon's at Mount Morris, and started him the next morning in pursuit of the watch and money. Parker's Minutes, pp. 56, 57. There is no evidence he ever got them other than hearsay. See page 56. Rainsford says: "I could not swear that he ever got the watch or money." He stayed at Sheldon's till about noon of Wednesday, March twenty-eighth, and returned to his residence in Victor; and on twenty-ninth March, eighteen hundred and sixty-six, made a supplemental schedule to his assignment, relieving it of the seventy-six acre farm.

It is a pleasant feature of this case to notice how affectionate this family was when property formed the basis of cohesion. Mrs. Rainsford's brother finds himself possessed of an assignment from her husband. Mrs. Rainsford and her father of a sudden discover that the old deeds after all were not burned, as the creditors had been told, but were in bodily existence. They

Mount from their funeral pyre on wings of flame.
And soar and shine no other but the same;
—Eclipsing the phœnix in the performance.

Carpenter, the father, executes his deed to his daughter March twenty-six, eighteen hundred and sixty-six, and gets it on record with that to himself, half an hour before Carpenter, the brother, who is slower of foot, gets his assignment on record. The fable of the phœnix is fable no longer, as the records of Ontario county show. Mr. Rainsford gets home on or about the twenty-ninth of March, eighteen hundred and sixty-six, after having made his opportune visit to his nephew and niece at Mount Morris. On that day he supplements his assignment to meet the exigencies of these records, and accepts the hospitalities of his wife's home, whose familiar features all resemble his old homestead. Instead of saying to his wife, "Your deeds are dormant, and I have, with your and your father's consent and aid, been trusted by creditors who have given me their credit and money and

property on the faith of this house and farm, and good faith requires its surrender to them," he accepts the situation; having a few days before told a creditor he had nothing to pay with, but would get millions for defence. Parker's Minutes, p. 65.

This farm of seventy-six acres had increased in value, and it is a mockery of creditors to say that as against them this farm over and above the fifteen hundred dollar mortgage was not his property. If he had prospered, the deeds were ashes; having failed, they were records. This will not do. What I have referred to as "Parker's Minutes," is the testimony of Mr. Rainsford taken before Mr. G. T. Parker, referee, in proceedings on his petition for his discharge from execution for a conversion of the oats of William Wager, a judgment creditor.

I omitted to notice that on Monday, March twenty-sixth, eighteen hundred and sixty-six, the assignee telegraphed the Albany consignee of the assignment; and Rainsford's drafts on him were all dishonored.

The petitioner in this case states willful false swearing in the affidavits to Schedule B in bankruptcy and in his final affidavit for discharge. Second, a concealment of his property and its reservation for himself and family. All that he did in respect to his assignment originally was done under the advice of Messrs. Ives and Harris. The supplemental schedule and the bankruptcy proceedings under the advice of Mr. E. M. Morse, of Canandaigua, who appears as his counsel before me.

It is urged that perjury cannot be assigned upon an oath made under the advice of counsel. 2 Whart. § 2204; U. S. v. Conner [Case No. 14,847]; 4 Keyes [*43 N. Y.] 397. See, also, 57 Barb. 625. Assuming this to be so, it is obvious that the bankrupt act, as well as common sense, makes a distinction between willfully swearing false in these affidavits and the crime of perjury. See section 29. Perjury is the willfully and corruptly swearing false. Section 7. Corruption is an element of crime. The advice of counsel may shield a client from corrupt intent, but cannot adjust the rights of property as between him and his creditors, or relieve him from the fact that he actually intended what he did. It is claimed that his oath that he had no assets and had stated all his property in the bankruptcy proceedings, and his final affidavit, are willfully false. The final affidavit states that he had not made fraudulent payment, gift, transfer, conveyance or assignment of any part of his property, and had made no fraudulent preference, or been guilty of any fraud contrary to the true intent and meaning of the act. See rule 49, N. D. New York. The act also avoids a discharge where the debtor has concealed any part of his estate. Section 29. This is the principal question in this case, for if, under the circumstances, he has done this within the true intent and meaning of the act, he

swore willfully false in the sense of deliberate intention, though he may not have committed perjury. It will be observed that what would prevent will invalidate a discharge, if the appropriate remedy be sought, as it is in this case. 57 Barb. 249.

In the proceeding in which Mr. Parker took testimony, it was held by the supreme court, at the June special term, eighteen hundred and sixty-eight, Justice E. Darwin Smith giving his opinion, that the deeds to Carpenter and by him to Mrs. Rainsford, were fraudulent and void as to the creditors of Rainsford, being a voluntary conveyance of property held in trust for and to the use of the debtor and his family, and that those deeds were dormant as to creditors. See Perine v. Dunn, 3 Johns. Ch. 508. In Re Hussman [Case No. 6,951], Ballard, J., says: "A fraudulent conveyance, I have already said, made by a debtor anterior to the passage of the bankruptcy statute, will not of itself preclude his discharge; but in such case he should not conceal nor attempt to conceal the fraud when he comes to ask the benefit of the statute. He should come into court with clean hands, or at least with a clear conscience, and disclose fully all property and rights of property which his creditors may appropriate in satisfaction of their claims," and holds the fraud continuous. Section 14 vests in the assignee all property conveyed by the bankrupt in fraud of his creditors. See, also, Anonymous [Id. 462]. In Martin v. Smith [Id. 9,164], the circuit court of Missouri held that the fraud was continuous. In that case the court says: "Equity looks at substance, and not form. It penetrates beyond externals to the substance of things, and it accounts as nothing, and delights to brush away barricades of written articles and formal documents, when satisfied they have been devised to conceal or protect fraud." In re Meyers [Id. 9,518], by Blatchford, J., is a case of husband and wife, worth considering in this. An instructive case is In re Adams [Id. 43], where Judge Lowell, of Massachusetts, says: "If the bankrupt and his wife had surrendered this property as soon as the mistake was discovered, the case would stand very differently;" and proceeds to make other statements I will not quote, but which are worth studying. Keep in mind that Rainsford eagerly availed himself of this fraudulent record as to creditors on discovery, and did not seek to adapt himself to the honesty of the transaction, but to adapt his schedule to the record, to the exclusion of his creditors, and the swearing the home farm to himself and family. See, also, In re Brodhead [Id. 1,918]; In re Rathbone [Id. 11,581, 11,583]; In re Hill [Id. 6,483]; In re Goodridge [Id. 5,547]; Goodwin v. Sharkey [5 Abb. Prac. (N. S.) 64]; Bump, Bankr. (3d Ed.) 298, 299, 376, 377, and cases cited. It is none the less voidable where there is a pecuniary consideration, where the element of good faith is

wanting. Lukins v. Aird, 6 Wall. [73 U. S.] 78, and cases cited.

It can hardly be necessary to pursue ·this investigation further. Here was a secret deed, not only unknown to but deliberately concealed from creditors whom Rainsford purposely informed it was destroyed and that he had title, till the question arose between Rainsford and his creditors, and then it was galvanized into an apparent vitality, by some method known. doubtless, to the brother of Mrs. Rainsford, and for the very purpose of defeating creditors who had confided in Rainsford's title, by the acquiescence, and aid of his wife and her father. The primary and cardinal idea of the bankrupt law is equality among creditors, and it reverences that old mother of many commercial virtues—good faith. The special term of the supreme court, in a direct proceeding to which Rainsford was a party on his own petition, has held him guilty of the fraud. I need not decide how much weight should be given to this decision which remains unreversed. See Hussman's Case [supra]. The course the trial of this case has taken before me, makes it proper that I should say, that whatever may be the weight of authority of this decision, the judge who pronounced the opinion is of conceded eminent legal ability, and howsoever tried or tempted, is of inflexible integrity.

I feel not only justified, but called upon to say, that I regard a debtor who has had his neighbor's credit, or money or other property to his own use, for which he makes no pecuniary return, can at least afford in his bearing toward such a creditor to introduce into it the element of civility. I do not mean cringing, but simple courtesy. The debtor owes an active duty to his creditor. A creditor who has had flouted in his face the taunt of "nothing to pay but millions for defence," has a right to feel that his rights and the laws of decorum are violated. Honesty inverts the expression in its substantial effect—all for payment and nothing for resistance, hindrance or delay to the collection or payment of an honest debt. Honesty comes without dissimulation or disguise, and invites the amplest investigation. No dark chamber hides from enquiring creditors any secrets in regard to property. But this respondent has gone further. Reputable gentlemen, who are his creditors and strove to be his friends, have been assailed persistently, simply because they seek in legal modes, the redress equity desires to afford them. They come into court with clean hands and consciences, and find a debtor there who seeks to intimidate them by threats and abuse. Fraud has become so much the rule in some men's minds, that they seem to think a creditor, whose property they have consumed without equivalent, has no rights a scheming debtor is bound to respect. It is time this indecorous mode of warfare ceased.

Two centuries ago old John Bunyan treated the world to the following colloquy in his "Life and Death of Mr. Badman": Wiseman.—He (Badman) gives a great and sudden rush into several men's debt to the value of about four or five thousand pounds, driving at the same time a very great trade, by selling many things for less than they cost him. to get custom, therewith to blind his creditors' eyes. His creditors, therefore, seeing that he had a great employ and dreaming that it must at length turn to a very good account to them, trusted him freely, without mistrust, and so did others, too, to the value of what was mentioned before. Well, when Mr. Badman had well feathered his nest with other men's goods and money, after a little while he breaks.

After showing how he effects a fraudulent compromise, good old Bunyan adds, by Wiseman's mouth: So the money was produced. releases and discharges drawn, signed, and sealed, books crossed and all things confirmed; and then Mr. Badman can put his head out of doors again, and be a better man than when he shut up shop by several thousand pounds. Attentive.—And did he thus indeed? W.—Yes; once and again. 1 think he broke twice or thrice. A.—And did he do it before he had need to do it? W.— Need! What do you mean by need? There is no need at any time for a man to play the knave. He did it of a wicked mind to defraud and beguile his creditors. * * * A. —Why this was a mere cheat. W.—It was a cheat indeed. This way of breaking is nothing else but a more neat way of thieving, of picking of pockets, of breaking open of shops, and of taking from men what one has nothing to do with. No man that has conscience to God or man can ever be his craftsmaster in this hellish art. * * * He could make them glad to take a crown for a pound's worth, and a thousand for that for which he had promised before to give them four thousand pounds. A.—This argueth that Mr. Badman had but little conscience. W.— This argueth that Mr. Badman had no conscience at all; for conscience, the last spark of a good conscience, cannot endure this.

So much from Bunyan. I ought perhaps to add that soon after his assignment, Rainsford was indicted in Ontario county, for obtaining money under false pretences. The claim on the civil side was settled with the claimant by his (Rainsford's) wife, and an arrangement perfected with the creditor—a bank at Canandaigua—to carry along the business to be done by Rainsford, the paper being given by the wife. Rainsford kept on as aforetime, enjoying this property and other real estate bid in by him for her on the assignee's sale, the creditors, meanwhile, being kept at bay. The indictment, of course, never was tried.

If such misdemeanors can be upheld in law and equity. commercial integrity and creditors' rights are among the things of the

past. The law in its stern sense of justice does not tolerate them. I have no hesitation to hold that this bankrupt did willfully swear falsely in his said several affidavits, in the manner above stated, and did conceal his estate, as alleged in the petition, within the true intent and meaning of the bankrupt act, and that the prayer of the said petitioner should be granted. I have omitted many matters proved, regarding those stated as sufficient to elucidate the line of thought I have adopted, and the conclusion reached. The discharge should be set aside and annulled.